# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| GLOBAL PETROMARINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 06-0189-CV-W-FJG |
| | ) | |
| G.T. SALES & MANUFACTURING, INC., | ) | |
| d/b/a HEWITT, U.S.A. | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| HBD INDUSTRIES, INC. | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## **ORDER**

Currently pending before the Court is Third-Party defendant's, (HBD Industries, Inc., hereinafter "HBD") Motion for Partial Summary Judgment (Doc. No. 56).

**I. Facts.[1]**

Before the Court will describe the detailed facts surrounding HBD's motion, it must first provide a background which will give the current motion context. This case involves the purchase and sale of 17 Hewitt 6918 flexible submarine hoses, used to transport Syrian heavy crude oil. These hoses were the subject of three separate and distinct contracts: (1)

---

[1] In accordance with Local Rule 56.1(a), "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party." See Ruby v. Springfield R-12 Public School Dist., 76 F.3d 909, 911 n. 6 (8th Cir. 1996). Accordingly, all facts set forth in the Court's statement of facts will be taken from defendant's motion for summary judgment (Doc. No. 19) and defendant's suggestions in support (Doc. No. 20) unless otherwise specified.

a contract between HBD and Hewitt U.S.A. ("Hewitt"); (2) a contract between Hewitt and plaintiff Global Petromarine ("Global"); and (3) a contract between plaintiff and the Syrian Crude Oil Transportation Co. ("Scotraco"), a non-party. Global is a limited liability company located in Tripoli, Lebanon and Hewitt U.S.A. is a fictitious named company registered in Missouri and operated by GT Sales & Manufacturing, Inc., a Kansas corporation. HBD is a Delaware corporation with its principal place of business in Salisbury, North Carolina.

This action commenced when Global filed suit against Hewitt on March 2, 2006 for breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and negligent misrepresentation (Doc. No. 1). The series of contracts that occurred in this case is important to understanding how Global's claims evolved. First, Hewitt entered into a contract with HBD whereby HBD manufactured the hoses, tested them, and packaged them for shipment. Hewitt purchased the hoses from HBD for $96,500.00. Hewitt also purchased optional Kerosene testing of the hoses for $1,530.00 and shipping racks for $15,000.00 for a total purchase price of $113,030.00. Pursuant to the contract between Hewitt and HBD, thirteen mainline hoses were purchased for $5,600.00 each, and four tanker rail hoses were purchased for $5,925.00 each.

The second contract in this case was formed when Global entered into a contract with Hewitt whereby Hewitt sold Global the hoses it originally purchased from HBD. Global purchased the hoses from Hewitt for $125,547.00. With additional charges for miscellaneous expenses, kerosene testing, etc., the total purchase price was $132,172.00.

The third contract in this case was formed when Global resold the hoses to the Syrian Crude Oil Transportation Company ("Scotraco"), a nonparty. Global resold the

2

hoses to Scotraco for $161,054, an amount higher than it paid Hewitt. However, the contract between Global and Scotraco is not at issue in this case.

On July 1, 2002, HBD shipped the hoses to Scotraco in Syria. Within 90 days after the installation of the first of the hoses, Global then reported that the installed marine hoses began leaking. (Plaintiff's Complaint, ¶ 23, Doc. No. 27). Global informed Hewitt of the leaking hoses and Hewitt asked Global to ship it sections of the marine hoses for testing in the United States. (Id. at ¶¶ 25-26). After testing the hoses, Hewitt refused to refund the purchase price or replace the leaking marine hoses. (Id. at ¶ 27). Global alleges that more hoses kept going out of service.[2] (Id. at ¶ 28). Global then requested Hewitt to send a representative to Syria to inspect the hoses, but Hewitt refused. (Id. at ¶¶28-29). Because of Hewitt's refusal to replace the hoses or provide a refund, Global claims it was forced to purchase replacement hoses for Scotraco to substitute Hewitt's leaking hoses. (Id. at ¶ 34). Global paid $201, 906.00 for the replacement hoses. (Id. at ¶ 35). Thereafter, on May 2, 2006, Hewitt brought a third-party complaint against HBD to indemnify Hewitt for costs, fees, expenses, and damages because HBD designed, manufactured, tested, packaged, and shipped the subject hoses.

HBD, third-party defendant, filed its motion for partial summary judgment against Hewitt which is now before this Court. The subject of this motion only concerns the contract between HBD and Hewitt, the first contract in this series of three contracts for the purchase and sale of hoses. The facts surrounding the negotiations of the contract between HBD and Hewitt are laid out below.

---

[2]Currently, hoses bearing serial numbers 9188 and 9194 are still installed. Hoses bearing serial numbers 9185, 9190, and 9192 have never been used.

3

**Contract Negotiations**

Pat Stubbs, Customer Service Manager for HBD, negotiated the contract between HBD and Hewitt for the sale of the hoses to Hewitt. Bill Lesser, Director of Sales and Marketing for Hewitt, first negotiated and contracted with HBD for the purchase of the hoses, and then negotiated and contracted with Global for the sale of the hoses. Lesser offices conducted its negotiations from its offices in Kansas City, Missouri. Ibrahim Zaouk, Managing Partner of Global, negotiated and contracted with defendant Hewitt for the purchase of the hoses.

Prior to the negotiations for the contract between Hewitt and HBD, Hewitt had in its possession HBD's standard warranty, which is one year from the date the product is shipped from HBD's manufacturing plant. Hewitt understood that if Hewitt and HBD did not discuss a warranty, the controlling warranty would be one year from the date the hoses were shipped. Thus, Hewitt began negotiations with HBD for a non-standard warranty because of a fax Global sent to Hewitt on September 12, 2001 which read as follows: "Warranty of the hoses should be for a minimum of 1 year, in case you can extend it to more than 1 year it is more advantageous to us and can help us getting the offer."

The first communication Hewitt sent HBD regarding a non-standard warranty was on September 12, 2001. On September 12, 2001, Hewitt requested HBD to provide Hewitt a quote for the hoses and asked HBD the following: "Warranty: Can you give us a two year warranty?? One year full warranty with prorated warranty in second year." HBD considered Hewitt's September 12, 2001 request for a 2-year prorated warranty as a request for a non-standard warranty. On September 13, 2001, HBD internally approved Hewitt's request for a two-year prorated warranty. On September 14, 2001, HBD sent Hewitt "HBD Quotation

4

No. 7014" dated 9/14/01.  Subsequently, on September 20, 2001, HBD faxed a two-year prorated warranty to Hewitt which was a culmination of the discussions between HBD and Hewitt as to whether HBD would agree to a two-year prorated warranty and constituted HBD's approval of the two-year warranty for the contract between HBD and Hewitt.  After Hewitt received the two-year prorated warranty from HBD, Hewitt took that warranty language and placed it on Hewitt letterhead so it could send that warranty to Global along with Hewitt's Quote.   On September 25, 2001, Hewitt faxed Global Hewitt's Quote for the hoses.  Notably, the quote Hewitt faxed to Global makes reference to the 2-year limited warranty.

Although HBD and Hewitt agreed on a 2-year prorated warranty, Hewitt requested from HBD another change in the warranty because of an email Global sent to Hewitt on October 2, 2001 requesting a different warranty.  Global's email to Hewitt had stated "in reference to your warranty letter, please note that we have agreed with the client to advise a warranty of only 1-year from date of official receipt of goods to their warehouse.  Please advise a revised warranty term letter to include it in our technical office."  As of October 2, 2001, Hewitt was trying to make sure it negotiated for a date certain for the start of the warranty period.  Thereafter, on October 2, 2001, following receipt of the e-mail referenced in the immediately preceding paragraph, Hewitt sent a fax to HBD.  The subject of that fax was "Quote 7014 URGENT" and read:

> Rather than the 2 year prorated warranty. My customer would like a (1) year warranty from date of receipt of goods in their warehouse.  I think we should offer a warranty of 14 months from date of ocean bill of lading (no prorated portion).  This will give us a definite benchmark and not allow them to fool with the date of the receipt in their warehouse.
>
> Following receipt of the October 2, 2001 fax from Hewitt inquiring about a 14-month

warranty from date of ocean bill of lading, Pat Stubbs discussed Hewitt's request with HBD General Manager David Dockins, obtained Mr. Dockins' approval for the 14-month warranty from date of ocean bill of lading, and faxed Hewitt a countersigned copy of Hewitt's October 2, 2001 letter indicating HBD's approval of the 14-month warranty by writing: "OK Pat Stubbs 10-2-01." At this point, the parties had discussed two warranties and HBD had approved both the 2-year prorated warranty and the 14-month warranty with no prorated portion.

When Lesser received the countersigned letter from HBD approving the 14-month warranty, he considered the 14-month warranty to be a binding term of the contract between Hewitt and HBD, such that he could enforce that warranty on HBD as a portion of the contract between Hewitt and HBD. Following Lesser's receipt of the countersigned letter approving the 14-month warranty, Hewitt prepared a 14-month warranty on its letterhead in connection with Tender No. 2383 Syrian Crude Oil Transportation Co. Hewitt then faxed Global Hewitt's revised Quotation on October 2, 2001. Hewitt's revised Quotation to Global referenced a "14 month warranty as per attached" and included the 14-month warranty from ocean bill of lading dated October 2, 2001 which Hewitt and HBD agreed to in their October 2, 2001 countersigned letter.

The following language was stated in both the 2-year prorated warranty and the 14-month warranty that HBD and Hewitt agreed upon:

> Seller warrants that its products and material shall be free from defects in material and workmanship under normal use and service. On equipment and materials furnished by Seller but manufactured by others, Buyer shall accept in lieu of any liability of guarantees on the part of Seller, the benefits of guarantees as are obtained by Seller from such manufactures [sic] or vendors. SELLER MAKES NO WARRANTY OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY,

6

> EXPRESS OR IMPLIED, EXCEPT AS EXPRESSLY SET FORTH HEREIN. For any breach of warranty, Seller's liability and Buyer's exclusive remedy shall be limited, at seller's option, to the repair of the defective products and materials, F.O.B. seller's factory, or the repayment of the purchase price. Failure by Buyer to object or reject the products or materials delivered hereunder within 60 days from the date of shipment of the products or materials shall constitute an acceptance and waiver by Buyer of all claims hereunder on account of alleged errors, shortages, defective workmanship of material, breach of warranty or otherwise.

No negotiations took place as to these above-stated warranty terms. Rather, the parties only discussed the length of the warranty and from which date the warranty would begin to run. Additionally, the warranty terms provided above did not include a provision relating to indemnification, but it did contain an exclusive remedy provision limiting the seller's remedies to the repair of the defective products and materials or the repayment of the purchase price.

Despite the fact that Hewitt and HBD last discussed a 14-month warranty, Hewitt sent Global a fax on October 17, 2001 stating that the warranty was again revised and it attached the 2-year prorated warranty, and explained the operation of the warranty. This is because Hewitt believed that it had the option of offering either the 2-year prorated warranty to Global or the 14-month warranty. Following its receipt of the 2-year prorated warranty, Global proposed this warranty to Scotraco. Global proposed to Scotraco each of the warranties Global had received from Hewitt. On October 22, 2001, Global sent a fax to Scotraco which reads in part:

> As for the warranty period, please note that the warranty for the offered hoses is for 2 years from date of receipt of hoses in your warehouses as per the terms and conditions of Hewitt USA warranty term attached.

Notably, the warranty above was different than the warranty Hewitt faxed to Global which specified a 2 year prorated warranty from the date of ocean bill of lading as opposed to

7

from date of receipt of the hoses in the warehouse. In addition, HBD was not copied on the documents exchanged between Hewitt and Global on October 17, 2001 which discussed the change of warranty back to the 2-year prorated warranty. At no time between the October 2, 2001 letter agreement between Hewitt and HBD agreeing to the 14-month warranty and Hewitt's Purchase Order SOP88167 faxed to HBD on February 26, 2002 did Hewitt and HBD discuss a warranty.

Once the 2-year prorated warranty was settled between Hewitt and Global, Hewitt faxed Global its final proforma invoice on December 19, 2001. On February 26, 2002, Global faxed Hewitt its Purchase Order. On February 26, 2002, Hewitt faxed HBD Hewitt Purchase Order SOP88167, which was intended by Hewitt to be an acceptance of HBD's Quote 7014 dated September 27, 2001. Subsequently, on February 28, 2002, HBD faxed to Hewitt HBD's Order Acknowledgment referencing Hewitt's Purchase Order SOP88167 and confirming the purchase price of $113, 030 as set forth in HBD's Quote 7014.

After Hewitt sent Global the 2-year prorated warranty on October 17, 2001, neither of the parties exchanged discussions about the warranty until a problem later arose with the hoses.

**Post-Contract Communications Regarding Defects in the Hoses**

The first time Global reported to Hewitt a problem with any of the hoses was on January 16, 2003. Notably, Global did not make a warranty claim within 90 days after the date the hoses were shipped and had not rejected or otherwise objected to the hoses. On January 16, 2003, Global e-mailed Hewitt that Scotraco had reported a leak and stated "accordingly, please advise action to be taken towards this problem and if any additional information is needed from your side regarding this issue, especially that the hoses are still

8

under warranty." Hewitt then contacted HBD about this problem, but HBD General Manager David Dockins reported to Hewitt on October 29, 2004 that the hoses were out of warranty. Hearing that the hoses were out of warranty, Global emailed Hewitt on November 2, 2004, stating in part, "I was surprised to read that the hoses are out of warranty!! What happened about the 2-year warranty?" In response to Global's email, Hewitt e-mailed Global back on November 5, 2004 stating that the 2-year prorated warranty approved by HBD controlled the sale of the hoses to Global and Hewitt explained how the two-year prorated warranty operated.

Because Hewitt never repaired or replaced the hoses it sold to Global, this legal action ensued. Hewitt, believing that it has a right to indemnification in this suit, joined HBD as a third-party defendant in this action. HBD filed a partial motion for summary judgment in order for this Court to determine the remedies Hewitt would be entitled to in the event that HBD must indemnify Hewitt for any damages Hewitt pays to Global. In its motion for partial summary judgment, HBD requests that this Court enter an Order with the following findings:

> (1) finding as a matter of law that the contract between HBD and Hewitt consists of HBD Quote 7014 dated 9/17/01, Hewitt Purchase Order SOP88167, the sheet titled A Book of Technical Conditions for the Supply of Marine Hoses, and Hewitt's option to enforce either the 2-year prorated warranty or the 14-month warranty with no prorated portion, as contained in Exhibit 19.
>
> (2) finding as a matter of law that both the 2-year prorated warranty and the 14-month warranty are valid and enforceable warranty provisions and are a

9

part of the contract between HBD and Hewitt, with Hewitt able to elect which warranty controls;

(3) finding as a matter of law that HBD effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose in its contract with Hewitt;

(4) finding as a matter of law that both the 2-year prorated warranty and 14-month warranty effectively limited Hewitt's damages for breach of warranty to repair of the defective products and materials, F.O.B. seller's factory, or the repayment of the purchase price;

(5) enforcing the express warranty agreed to between HBD and Hewitt; and

(6) finding as a matter of law that HBD's liability, if any, to indemnify or hold Hewitt harmless is limited to $10,732 under the 2-year prorated warranty, or $5,600 under the 14-month warranty; and (7) granting HBD such other and further relief as the court deems appropriate.

Because there is no dispute between the parties on what constitutes the contract as a whole, the Court hereby finds that the contract between HBD and Hewitt consists of the following: HBD Quote 7014 dated 9/17/01, Hewitt Purchase Order SOP88167, the sheet titled A Book of Technical Conditions for the Supply of Marine Hoses, and Hewitt's option to enforce either the 2-year prorated warranty or the 14-month warranty with no prorated portion, as contained in Exhibit 19. In addition, although HBD admitted in its motion that Hewitt may elect from either the 14-month warranty or the 2-year prorated warranty, Hewitt states that it provided Global with the 2-year prorated warranty; thus according to Hewitt, it is the only valid and enforceable warranty. Therefore, the Court hereby finds that since

10

Hewitt has elected the 2-year prorated warranty, the 2-year prorated warranty is valid and enforceable and applies to the contract between HBD and Hewitt. The Court will make findings as to the remaining of HBD's requests below.

## II. Summary Judgment Standard.

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more

11

than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

## III. DISCUSSION

The issues before this Court are the following: (1) whether Missouri or North Carolina law applies to the contract; (2) whether Hewitt's potential right to recover implied-in-law indemnity from HBD is affected by the "exclusive remedy" provision contained in the 2-year prorated warranty document; (3) whether Hewitt effectively disclaimed implied warranties of merchantability and fitness for a particular purpose; and (4) whether the "exclusive remedy" provision contained within the applicable warranty is valid and enforceable under the Uniform Commercial Code.

### A.    Choice of Law

A district court sitting in diversity jurisdiction applies the choice of law rules for the state in which it sits. Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 687 (8th Cir. 2001) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941)).  Thus, we apply Missouri's choice of law rules.  Missouri law "provides that the law of the state with the most significant relationship to the transaction and parties govern." Viacom, Inc. v. Transit Cas. Co., 138 S.W.3d 723, 725 (Mo. 2004).  Missouri has adopted Section 188 of the Restatement (Second) of Conflicts of Laws which states that the following factors should be considered: "(a) the place of contracting, (b) the place of

12

negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Id.; Restatement (Second) of Conflict of Laws section 188(2); See also Dillard v. Shaughnessy, Fickel & Scott Architects, Inc., 943 S.W.2d 711, 715 (Mo. App. W.D. 1997).

Based on these above factors, HBD argues that North Carolina law applies because the place of performance and the location of the subject matter of the contract favors North Carolina. However, Hewitt argues that Missouri law applies because the contract was formed in Missouri and since the issues in this case concern the validity and effectiveness of contract terms, the place of contracting becomes a significant one. For the reasons set forth below, the Court finds that Missouri law applies to the contract between HBD and Hewitt.

### 1. Place of Contracting

The contract between HBD and Hewitt was formed in Kansas City, Missouri on February 26, 2002, when Hewitt accepted HBD's Quote 7014. The place of contract is the place where the last act necessary to form the contract occurs. Dillard, 943 S.W.2d at 716. In this case, the last act necessary to form the contract between HBD and Hewitt was Hewitt sending its Purchase Order to HBD from its offices in Kansas City, Missouri. However, Comment (e) to Section 188 cautions that standing alone, the place of contracting is a relatively insignificant contact. Dillard, 943 S.W.2d at 716. Comment (e) proceeds to state in relevant part:

> To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting.

13

Both parties agree that the place of contracting is Missouri but disagree on the significance of this factor.

    *2.    Place of Negotiation*

The place where the parties negotiate and agree on the terms of the contract is a significant contact. However, this contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct negotiations from separate states by mail or telephone. Dillard, 943 S.W.2d at 716. In the present case, the negotiations for the contract between HBD and Hewitt was conducted from separate states by faxes, telephone calls, and e-mails. In addition, the negotiations took place in both Missouri and North Carolina. Pat Stubbs, who maintains an office in Salisbury, North Carolina, negotiated the contract on behalf of HBD and Bill Lesser negotiated the contract on behalf of Hewitt from North Kansas City, Missouri. Thus, the place of negotiation favors neither Missouri or North Carolina. Both Hewitt and HBD agree that this contact favors neither state.

    *3.    Place of Performance and Location of the Subject Matter of the Contract*

HBD argues that the place of performance favors North Carolina because the contract was to be performed in Salisbury, North Carolina where the hoses would be manufactured, tested, packaged, and shipped. Further, HBD states that the hoses were located in North Carolina. Hewitt disagrees with HBD that the place of performance favors North Carolina because the significance of this contact depends upon its relationship to the particular issue as to which the determination of applicable law is needed. Comment (e) to Section 188 notes that this contact will have significance, where the issue concerns such matters as "the nature of the performance," the identity of "the party who is to perform," or

14

whether the performance contemplated by the contract would be illegal. Thus, Hewitt argues there is no such relationship between any performance contemplated under the contract and the particular issue involved here, which is the effectiveness of the exclusive remedy provision. In addition, Hewitt disagrees with HBD that the location of the subject matter is important because the location of the goods has no connection to the issue of what the rights of the buyer will be in the event the buyer is sued by its purchaser for a defect in those goods.

    4.  *Domicile, residence, nationality, place of incorporation, and place of business of the parties*

The Court agrees with the parties that the place of incorporation and place of business of the parties favors neither North Carolina nor Missouri. Hewitt, for instance, is a subsidiary of G.T. Sales, Inc., a Kansas corporation with its principal place of business in Wichita, KS. Hewitt is also a fictitious name registered in the state of Missouri with its principal office in North Kansas City, Missouri. HBD, however, is incorporated in Delaware and maintains its principal place of business in North Carolina.

Based on the above Restatement factors, the Court finds that Missouri law applies. The Court agrees with Hewitt that the place of contracting is a significant contact in this case. The Court recognizes that standing alone, the place of contracting is not a significant contact. However, because Hewitt's indemnification claim involves the effectiveness and validity of warranty terms in the contract, the place where the contract was formed is a relatively significant contact and Missouri bears the most significant relationship to the contract. "What matters is not a mechanical tally of these factors, but an analysis of their relative importance to the particular claim under consideration," which in this case is the

15

relative importance of the Restatement factors to the effectiveness of the exclusive remedy provision.  See Gateway W. Ry. v. Morrison Metalweld Process, Corp., 46 F.3d 860, 863 (8th Cir. 1995) (the court held that while plaintiff was based in Illinois and the contract was entered into there, Missouri law applied because the particular claim under consideration was improper performance by defendant and Missouri was the place of performance). Thus, although, the place of performance and the location of the subject matter of the contract favor North Carolina, these factors are not important to the particular claims under consideration as HBD's performance is not at issue.   Rather, what is at issue is the effectiveness of the exclusive remedy provision and the place of contracting is important to this issue.  Further, since the law of Missouri and North Carolina are substantially similar with respect to contract principles and the Uniform Commercial Code, applying Missouri law over North Carolina law will not affect the outcome of this case.

**B.    Whether Hewitt's potential right to recover implied-in-law indemnity from HBD is affected by the "exclusive remedy" provision contained in the 14-month or 2-year prorated warranty document**

HBD argues that if Hewitt has a right to indemnification under the contract and Hewitt is found liable to Global for the defective hoses, then Hewitt is limited to the exclusive remedy provision in the warranty agreement.  The 2-year prorated warranty states in relevant part that "For any breach of warranty, Seller's liability and Buyer's exclusive remedy shall be limited, at seller's option, to the repair of the defective products and materials, F.O.B. seller's factory, or the repayment of the purchase price."  Thus, HBD argues it is only obligated to repay the purchase price of the defective hoses that fall within the covered 2-year period in the event that this Court finds it must indemnify Hewitt.

16

HBD rejects any argument by Hewitt that it can recover the entire loss from HBD regardless of the exclusive remedy provision on the warranty.  In support of its argument, HBD cites to McDonald Brothers, Inc. v. Tinder Wholesale, LLC, 395 F. Supp. 2d 255, 268, n. 7 (M.D.N.C.), where the court stated in a footnote that if plaintiff ultimately prevails on its express warranty or implied warranty claims, it may only collect limited indemnity because "[p]laintiff's recovery would be limited by any valid contractual limitation of remedy."  Thus, HBD asserts that Hewitt's ability to pursue indemnification from HBD is limited by the valid limitation of remedy clause contained in the contract between HBD and Hewitt.

In response to HBD's argument, Hewitt argues that its right to recover implied-in-law indemnity from HBD is not affected by the "exclusive remedy" provision contained in the 2-year prorated warranty document.  In other words, the issue is whether an intermediate seller of a product, in this case Hewitt, is entitled to recover its "entire loss" from its seller, in the event it is held liable to its purchaser for a defect notwithstanding any "exclusive remedy" provision contained in the agreement between the parties.  First, Hewitt distinguishes the McDonald case that HBD relies on to counter its argument. Hewitt argues the McDonald statement that plaintiff's indemnity claim would be limited by any valid contractual limitation of remedy cannot be couched as the court's holding because it was only a hypothetical discussed in a footnote.  In addition, Hewitt asserts McDonald is unreliable because the court gave no reasoning to support its contention.  Lastly, Hewitt noted that unlike the plaintiff in McDonald, Hewitt is not asserting any claims for breach of express warranty or implied warranty.

17

Second, in support of its argument, Hewitt refers the Court to <u>Schweber Electronic v. National SemiConductor Corp.</u>, 174 Ariz 406 (Ariz. App. 1992), an Arizona Court of Appeals case, where a distributer of electronic components filed a third-party complaint against the manufacturer, seeking indemnity from a manufacturer after an end-user of the parts brought an action against both distributor and manufacturer. Hewitt argues that the facts of <u>Schweber</u> are similar to this case. The plaintiff in Schweber, a designer and seller of computer products, bought real time clock parts through defendant Schweber Electronics ("Schweber"), but manufactured by defendant, National Semiconductor Corporation ("National"). National and Schweber then entered into a "Distributor Franchise Agreement," which contained a similar exclusive remedy provision in the warranty as in the warranty between HBD and Hewitt. The warranty agreement between Schweber and National stated that National would only replace the defective parts or give the buyer credit for the cost of the parts. Plaintiff then received complaints from its customers about the clock parts and sued Schweber and National. Schewber subsequently filed a cross-claim against National seeking indemnity because National was the manufacturer of the clock parts.

On appeal, defendant National argued that the lower court erred in granting Schweber indemnification because the contract between them precluded National's liability for incidental and consequential damages and contained a limitation of remedies provision. The Arizona Court of Appeals, however, rejected National's argument and held that a manufacturer could not escape indemnity by adding limitation clauses to contracts with distributors and retailers. The court stated that the limitation clause would have limited National's damages to the terms of the contract if Schweber brought a suit against National

18

for breach of contract or breach of warranty. But since the case between Schweber and National only involved an indemnity claim between these two parties, the court made the distinction that the limitation of remedies did not apply to Schweber's claim for indemnification.

HBD replies that this case is distinguishable because Schweber involved a distributorship agreement between National and Schweber, while HBD and Hewitt did not have such an agreement. HBD also notes that Hewitt gave Global a warranty that was independent of HBD's warranty to Hewitt and Hewitt was not required to give Global the same warranty as it had with HBD. Additionally, HBD argues that in order to give meaning to the term "exclusive remedy," it must be interpreted to include claims for indemnification. HBD also disagreed with plaintiff's Hewitt's interpretation of McDonald and stated that while Hewitt does not expressly assert claims for breach of warranty and implied warranty against HBD, the basis of the indemnity claim against HBD is breach of warranty – HBD's alleged failure to provide its products free from defects in material and workmanship under normal use and service.

The Court finds that it is unable to determine at this time whether Hewitt's right to recover under an implied indemnity theory, assuming Hewitt has such a right, is limited by the exclusive remedy provision contained within the 2-year prorated warranty document. The Court hereby orders HBD to provide a full briefing containing relevant law from Missouri on the issue of whether Hewitt's potential right to recover implied indemnity is affected by the exclusive remedy provision or the disclaimer of implied warranties in the contract. Because the issue of implied indemnity must be determined before the Court

19

reaches the remaining issues raised in HBD's motion, the Court hereby **PROVISIONALLY DENIES** HBD's motion for partial summary judgment.

## IV. CONCLUSION

Third-Party defendant's, HBD, Motion for Partial Summary Judgment (Doc. No. 56) is **PROVISIONALLY DENIED**. The Court further orders HBD to provide a response to the Court's Order by **Wednesday, September 26, 2007**.

**IT IS SO ORDERED.**

Date:  9/18/07                                         **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                       Fernando J. Gaitan, Jr.
                                                       Chief United States District Judge