## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| GLOBAL PETROMARINE, ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> G.T. SALES & MANUFACTURING, INC., ) <br> d/b/a HEWITT, U.S.A. ) <br> Defendant/Third-Party Plaintiff, ) <br> vs. ) <br> ) <br> HBD INDUSTRIES, INC. ) <br> Third-Party Defendant. ) | No. 06-0189-CV-W-FJG |

**ORDER**

Pending before the Court is Third-Party Defendant HBD Industries Inc.'s ("HBD") Motion for Partial Summary Judgment (Doc. No. 196) and Third-Party Plaintiff G.T. Sales & Manufacturing, Inc. d/b/a/ Hewitt U.S.A.'s ("Hewitt") Motion for Partial Summary Judgment (Doc. No. 206).

**I.   BACKGROUND[1]**

This case involves the manufacture, purchase and sale of 17 submarine hoses designed to transport Syrian crude oil. Global Petromarine ("Global") is a limited liability company located in Tripoli, Lebanon and Hewitt U.S.A. is a fictitious named company registered in Missouri and operated by GT Sales & Manufacturing, Inc. a Kansas corporation. HBD is a Delaware corporation with its principal place of business in Salisbury, North Carolina.

---

[1] In accordance with Local Rule 56.1(a), "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party." See Ruby v. Springfield R-12 Public School Dist., 76 F.3d 909, 911 n. 6 (8th Cir. 1996). Accordingly, all facts set forth herein are taken from both parties' motions for partial summary judgment (Doc. Nos. 196 and 206) and the Joint Stipulation of Facts (Doc. No. 256).

In fall 2001, Global began negotiating with Hewitt for purchase of the submarine hoses. Hewitt, in turn, commenced negotiations with HBD for the manufacture and purchase of the hoses. Hewitt entered into a contract with HBD for the manufacture, testing and packaging of the hoses. Hewitt purchased thirteen "main line" hoses at a price of $5,600 each and four "tanker rail" hoses at a price of $5,925 each, for a total of $96,500. Hewitt also purchased optional kerosene testing of the hoses for $1,530 and shipping racks for $15,000, for a total purchase price of $113,030. Hewitt also entered into a contract with Global, under which Global purchased the hoses from Hewitt for a total cost of $132,172. Global then re-sold the hoses to the Syrian Crude Oil Transportation Company ("Scotraco"), the ultimate buyer and not a party in this case.

HBD's standard warranty provided coverage for one year from the date the product is shipped from HBD's manufacturing plant. As negotiations progressed, however, Hewitt requested and HBD granted a warranty covering "a period of one year from date of Shipment with a prorated warranty for the Second year of service." Hewitt placed the warranty terms on Hewitt letterhead and submitted it to Global along with Hewitt's price quote for the hoses. HBD and Hewitt agreed that the hoses' design, manufacture and testing would comply with international industry standards known as the "OCIMF Guidelines,"[2] and Hewitt made the same promise to Global.

The hoses were shipped to Syria on July 1, 2002. On January 16, 2003, Global reported to Hewitt that one of the hoses was leaking, and requested confirmation that the hoses were still under warranty. At Hewitt's request, sections of the hoses were shipped back to Hewitt for testing. Finding the leaking was not due to a defect in

---

[2] Oil Companies International Marine Forum ("OCIMF") Guide to Purchasing, Manufacturing and Testing of Loading and Discharge Hoses for Offshore Moorings (4th Edition, 1991).

manufacturing or workmanship, Hewitt refused to refund the purchase price of the hoses or to replace the leaking hoses. Over the next year, Scotraco reported problems to Global, and Global relayed them to Hewitt. On October 29, 2004, in response to Hewitt's inquiry, HBD's General Manager wrote to Hewitt stating that the hoses were out of warranty. Through 2005, Hewitt informed HBD that Global claimed the hoses were defective, did not conform to the specifications in the contract between Hewitt and Global, and did not meet the OCIMF standards. Also in 2005, Hewitt informed HBD that Global threatened to sue Hewitt for damages it sustained as a result of alleged defects in the hoses. Global eventually purchased replacement hoses from another source.

On March 2, 2006, Global commenced this action against Hewitt. Global's Second Amended Complaint against Hewitt alleges breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for particular purpose, negligent misrepresentation, and in the alternative, rescission of the contract and restitution for the purchase cost of the hoses.

In its Answer to the Second Amended Complaint, Hewitt denied liability to Global and asserted a third-party claim against HBD. Hewitt alleged HBD was obligated to indemnify Hewitt against, and hold Hewitt harmless from, the claims asserted against Hewitt by Global on the basis that HBD designed, manufactured, tested, packaged, and shipped the hoses and allegedly warranted the subject hoses. In its Answer to Hewitt's third-party claim, HBD denied that it was obligated to indemnify or defend Hewitt against the claims asserted by Global.

Hewitt alleges HBD warranted the hoses, and HBD admits that it provided a limited warranty for the hoses. The contract between Hewitt and HBD includes the

following: HBD Quote 7014 dated September 27, 2001, Hewitt Purchase Order SOP88167, the sheet titled *A Book of Technical Conditions for the Supply of Marine Hoses*, and Hewitt's option to enforce either the two-year prorated warranty or a 14-month limited warranty with no prorated portion. Hewitt opted to enforce the two-year prorated warranty.[3]

HBD originally moved for summary judgment on April 24, 2007, seeking an order that, *inter alia*: (1) as a matter of law, HBD effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose, (2) Hewitt's damages to Global for breach of warranty were limited, by either the two-year prorated warranty or the 14-month warranty, to repair of the defective products and materials or repayment of the purchase price, and (3) HBD's liability, if any, to indemnify Hewitt was limited to $10,732 under the two-year prorated warranty or $5,600 under the 14-month warranty. Hewitt

---

[3] The full text of the two-year prorated warranty states:

> Seventeen (17) 12" x 30 ft Hewitt 6918 Submarine Hose Bin with 150# CS WB FF Galvanized Flanges on Quote 7014 dated 9/14/01 warranty for a period of One year from date of Shipment with a prorated warranty for the Second year of service. Standard warranty applies as follows.
>
> Seller warrants that its products and material shall be free from defects in material and workmanship under normal use and service. On equipment and materials furnished by Seller but manufactured by others, Buyer shall accept in lieu of any liability of guarantees on the part of Seller, the benefits of guarantees as are obtained by Seller from such manufactures or vendors. SELLER MAKES NO WARRANTY OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS IS EXPRESSLY SET FORTH HEREIN. For any breach of warranty, Seller's liability and Buyer's exclusive remedy shall be limited, at seller's option, to the repair of the defective products and materials, F.O.B. seller's factory, or the repayment of the purchase price. Failure by Buyer to object to or reject products or materials delivered hereunder within 60 days from the date of shipment of the products or materials shall constitute an acceptance and waiver by Buyer of all claims hereunder on account of alleged errors, shortages, defective workmanship of material breach of warranty or otherwise.

also moved for summary judgment on each of the claims asserted against it by Global. In the alternative, Hewitt requested summary judgment against HBD on Hewitt's claim for indemnity.

On September 17, 2007, the Court ruled on HBD's Motion for Summary Judgment, finding the applicable warranty in the contract between HBD and Hewitt was the two-year prorated warranty, but the Court did not determine the issue of whether Hewitt had a right to indemnity. On March 12, 2008, the Court denied both aspects of Hewitt's summary judgment motion. Thereafter, Global and Hewitt reached a settlement in the amount of $115,000 for the claims Global asserted against Hewitt. The Court issued a final ruling, on April 11, 2008, clarifying that its March 12, 2008 Order held Hewitt was not entitled to indemnity from HBD and disposed of all of Hewitt's claims against HBD.

On appeal, the Eighth Circuit found the District Court made an improper finding that Hewitt was not entitled to implied indemnity because HBD did not retain a duty to Global co-extensive and identical to the duty that Hewitt maintained to Global. Global Petromarine v. G.T. Sales & Mfg, Inc., 577 F.3d 839, 847 (8th Cir. 2009). Instead, the Court explained:

> The mere inclusion of the additional 90-day warranty found in Hewitt's brochure to its customers would not necessarily cause Hewitt's obligations to Global to lose its coextensive and identical character with HBD's obligations to Global. HBD proposed the language of the two-year prorated warranty, HBD presented that language to Hewitt, and HBD agreed that Hewitt could include the two-year warranty in Hewitt's contract with Global, after negotiations were held among Global, Hewitt, and HBD. Those negotiations included considerable collaboration between Hewitt and HBD.

5

Id. The Eighth Circuit thus found two grounds on which Hewitt may be entitled to indemnification from HBD. First, "[i]f Global is able to recover from Hewitt based on the two year prorated warranty that was originally presented to Hewitt by HBD, Hewitt might be entitled to indemnification." Id. In addition, "if Hewitt is responsible because the hoses were not manufactured in compliance with OCIMF requirements, HBD could be obligated to indemnify Hewitt because HBD bore the same obligation under its contract with Hewitt." Id. Based on this reasoning, the Court identified questions of material fact concerning the extent to which, and the basis for, Hewitt's liability to Global, and HBD's corresponding duty to indemnify Hewitt. See id. The Court also directed the District Court to examine the settlement reached between Hewitt and Global and determine how the terms of the settlement bear on Hewitt's indemnification claim.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule

Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

### III. DISCUSSION

Hewitt seeks indemnification from HBD for the portion of its settlement with Global that is based on claims pertaining to alleged defects in the subject hoses. Hewitt also seeks attorneys' fees and costs for defending against Global's claims to the extent such expenses were incurred after HBD was notified of Global's action against Hewitt, and are attributable to indemnifiable claims. Finally, Hewitt argues the limitation of remedies provision in its contract with HBD does not affect its right to indemnification.

HBD seeks partial summary judgment on the grounds that HBD's liability to indemnify Hewitt, if any, is limited to the express terms of the warranty between HBD and Hewitt. Specifically, if Hewitt establishes that the hoses failed because of a defect in the manufacture, testing or packaging of the hoses and if Hewitt establishes that it is, therefore, entitled to indemnification from HBD, HBD's liability is limited to $10,733.34 under the two-year prorated warranty contained in the HBD-Hewitt contract.

Thus, the issues arising from the parties' cross-motions for partial summary judgment pertain to their rights under the contract, most importantly, determination of the applicable warranty or warranties under the contract, and the application of the limitation of remedies provision on those warranties. In addition, the Court must

7

determine whether Hewitt has an implied right to indemnity, as Hewitt may be entitled to indemnification for any claims asserted by Global for which HBD shared a coextensive duty and obligation with Hewitt.

**A. HBD-Hewitt Contract**

    (i)    Applicable Law

Hewitt argues the contract between HBD and Hewitt is governed by North Carolina law because that is where HBD delivered the hoses to Hewitt. Under Missouri choice-of-law rules, rights and liabilities created by an agreement for the sale of goods are determined by the law of the state where the goods are delivered. Restatement (Second) of Conflicts of Law § 191 (1971).

This Court previously ruled that Missouri law applies to the contract between HBD and Hewitt. On appeal, the Eighth Circuit affirmed that decision, holding Missouri law applies to Hewitt's claims against HBD. Global Petromarine, 577 F.3d at 844-45. Under the law of the case doctrine, "a decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice." Yankton Sioux Tribe v. Podhradsky, 606 F.3d 994, 1005 (8th Cir. 2010). Hewitt produced no new evidence to support application of North Carolina law, and does not claim application of Missouri law is either clearly erroneous or works a manifest injustice. Therefore, the law of the case doctrine dictates that Missouri law applies.

In addition, the parties agree that Article 2 of the Uniform Commercial Code applies to the HBD-Hewitt contract because it involves a sale of goods. The UCC is adopted in Missouri as R.S. Mo. § 400 *et seq.*

(ii) Implied Warranties

HBD seeks a ruling that it properly disclaimed the implied warranties of merchantability and fitness for a particular purpose. Yet, Hewitt did not address this issue in its responsive pleading. Since the warranties available to Hewitt are disputed, a ruling on whether HBD properly disclaimed the implied warranties is relevant to interpretation of the contract.

In order to exclude or modify the implied warranty of merchantability or any part of it, the disclaimer language must mention "merchantability" and, in the case of a writing, must be conspicuous. R.S. Mo. § 400.2-316. Similarly, to exclude or modify an implied warranty of fitness for a particular purpose, the exclusion must be in writing and must be conspicuous. R.S. Mo. § 400.2-316. A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. R.S. Mo. §400.1-201(10). Language in the body of a form is conspicuous if it is in larger or other contrasting type or color. Karr-Bick Kitchens & Bath, Inc. v. Gemini Coatings, Inc., 932 S.W.2d 877, 879 (Mo. Ct. App. 1996).

The HBD-Hewitt contract states:

> "SELLER MAKES NO WARRANTY OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS EXPRESSLY SET FORTH HEREIN."

Because the disclaimer is in capital letters, includes the word "merchantability" and is in writing, the disclaimer is conspicuous under §400.1-201(10). Thus, HBD properly disclaimed both implied warranties of merchantability and fitness for a particular purpose as a matter of law. R.S. Mo. § 400.2-316; Id.

(iii) Express Warranties

HBD and Hewitt agreed to a limited warranty that "[Seller's] products and material shall be free from defects in material and workmanship under normal use and service" (hereafter, "Limited Warranty").  Hewitt argues, however, that HBD sold the hoses to Hewitt with an additional warranty that the hoses would comply with the OCIMF standards.  In effect, Hewitt claims HBD sold the hoses to Hewitt with two express warranties- the Limited Warranty and an OCIMF warranty- and that HBD understood and agreed that Hewitt would re-issue both warranties to its customer, Global.  Further, Hewitt contends breach of the so-called "OCIMF warranty" entitles Hewitt to indemnification because it is not subject to the limitation of remedies provision in the HBD-Hewitt contract.

HBD argues a separate and distinct "OCIMF warranty" does not exist, as the only warranty in its contract with Hewitt was the Limited Warranty, which includes HBD's agreement that the hoses would comply with OCIMF standards.  HBD reasons that "any failure to comply with the performance standards set forth by the OCIMF would necessarily be the result of a defect in materials and/or workmanship, such that any alleged 'OCIMF warranty' is merely one component of the written, limited warranty."  HBD alternatively argues that if the Court finds an OCIMF warranty does exist, it was properly disclaimed because R.S. Mo. §400.2-316 allows express warranties to be disclaimed or limited if the disclaimer is not unreasonable.

The threshold issue is thus whether the contract between HBD and Hewitt included a separate, express warranty that the hoses would comply with OCIMF standards, or, alternatively, that HBD's promise that the hoses would be OCIMF-compliant was encompassed within the Limited Warranty negotiated by the parties.

Under R.S. Mo. §400.2-313(1), "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. A description may consist of technical specifications." See Northern States Power Co. v. ITT Meyer Ind., 777 F.2d 405, 411 (8th Cir. 1985) (finding seller created express warranty where it adopted buyer's technical specifications into the contract) (applying Minnesota law); R.S. Mo. § 400.2-313 cmt. 5 (1996) ("A description need not be by words. Technical specifications . . . can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them.")

The HBD-Hewitt agreement includes the sheet titled *A Book of Technical Conditions for the Supply of Marine Hoses*, which sets forth specifications for marine hoses and requires the hoses be "manufactured according to international specifications "OCIMF" for the year 1991[.]" "OCIMF" is also cited in Quotation No. 7014 that HBD issued to Hewitt, and in Hewitt's Purchase Order, both of which constitute part of the agreement. Based on the materials that constitute the parties' contract, it is clear that compliance with the OCIMF technical specifications was a basis of the bargain and an express warranty arose by description of the goods as a matter of law. R.S. Mo. § 400.2-313.

Having found the technical specifications gave rise to an express warranty, the next issue before the Court is whether the parties intended it to be a component of the Limited Warranty and, if not, whether it was validly disclaimed under R.S. Mo. § 400.2-316. The Limited Warranty in the HBD-Hewitt contract is unambiguous: "[s]eller

warrants that its products and material shall be free from defects in material and workmanship under normal use and service."

There are two ways in which the hoses could be non-compliant with the OCIMF performance specifications and, thus, breach the OCIMF warranty. First, the materials such as the rubber or hardware in the hoses could be defective. Such a defect would fall within the plain language interpretation of the warranty against "defects in material." Next, the workmanship of the hoses could be deficient in that the testing, manufacturing or general performance does not meet the OCIMF standards. Thus, any non-compliance with the technical specifications would necessarily be a defect in material or workmanship, or both. The OCIMF technical specifications fall comfortably within the general warranty language against defects in material and workmanship. Therefore, the express OCIMF warranty does not create separate grounds for relief. See Community Television Services, Inc. v. Dresser Indus., Inc., 586 F.2d 637 (8th Cir. 1978) (finding seller's technical specification warranty was amplified by affirmations made in advertising materials prior to purchase, thus creating extra-contractual grounds for relief). Accordingly, the express warranty that HBD would manufacture the hoses in compliance with OCIMF standards was part and parcel of the Limited Warranty.

      (iv)    Disclaimer of Warranty

Even if, however, the Court found the express warranty arising from description of the goods was not encompassed within the Limited Warranty, the Court concludes such express warranty was properly disclaimed.

Under R.S. Mo. §400.2-316(1), "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but . . . negation or limitation is inoperative to the extent that such construction is unreasonable."[4]  The disclaimer language in HBD's contract with Hewitt states as follows:

> SELLER MAKES NO WARRANTY OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS IS EXPRESSLY SET FORTH HEREIN.

This disclaimer is effective against the express OCIMF warranty, unless such construction is unreasonable.  Here, the parties are sophisticated commercial actors that have an established relationship of manufacturer and distributor.[5]  To accommodate its end-buyer, Hewitt negotiated for an extended two-year prorated warranty with HBD.  Lesser, who negotiated both contracts on behalf of HBD, copied the HBD-Hewitt warranty terms onto Hewitt letterhead for issuance to Global.  Lesser's

---

[4] The Official Comment to §2-316 states, "[t]his section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express or implied." It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise." R.S. Mo. §400.2-316, cmt. 1.

[5] Deposition of Mary Stubbs, Customer Service Manager for HBD:
Q:  And does Hewitt have any type of agreement with HBD to be a representative or a seller or anything of that type of submarine hoses? Are they an authorized agent of HBD? Is there any type of formal documentation?
A:  No.
  (Doc. No. 196, Ex. 9 at 24:15-23)

Q:  The relationship as far as you were concerned was when you got a fax in or an email for a request for quote?
A:  Right. They're on my database as a distributor.
  (Doc. No. 196, Ex. 9 at 25: 1-4) (objections omitted).

testimony below indicates Hewitt understood the warranty terms, and corresponding liability in case of breach:

> Q: When [the 14-month and two year prorated warranties] were sent to Global, did you understand that Hewitt was promising Global that for the period of time described, that Hewitt would honor and make that warranty effective if there were a defect?
>
> A: Well, yes, we did issue facts – or fax to Ibrahim (Global) several warranties. And if – you know, if a problem or failure was found to be a manufacturing defect due to the hoses being built by HBD, Hewitt would honor the warranty.

(Doc. No. 196, Ex. 8 at 218:15-219:1) (objections omitted). Thus, the facts support that Hewitt was knowledgeable of the warranty, and the disclaimer included therein is not an unexpected or unbargained-for term. It is, therefore, not unreasonable to give full effect to the language disclaiming "ANY OTHER WARRANTY, EXPRESS OR IMPLIED," to render the express OCIMF warranty disclaimed. In addition, the law of Sales generally does not impute liability for breach of warranty on the manufacturer where the manufacturer properly disclaimed express warranties:

> When the manufacturer sells the goods to a dealer who resells the goods to the ultimate purchaser, the dealer cannot sue the manufacturer if the manufacturer includes, in the contract, a disclaimer of warranties that satisfies U.C.C. § 2-316. The fact that the manufacturer is thus protected from liability does not protect the dealer who resells the goods without making its own disclaimer of warranties. That is, the manufacturer's disclaimer of warranties does not run with the goods so as to protect any subsequent seller of them. To the contrary, each subsequent seller must make its own independent disclaimer in order to be protected from warranty liability.

3A Anderson, Uniform Commercial Code §2-316:150 (3d ed. 1983); see Karr-Bick Kitchens, 932 S.W. at 879 (citing text to explain manufacturer's disclaimer of warranties is different than reseller's disclaimer of warranty).

Because Hewitt understood and bargained for the Limited Warranty with HBD, the Court finds the disclaimer of warranties contained therein is not unreasonable. HBD properly disclaimed all express warranties pursuant to R.S. Mo. §400.2-316, including the express warranty arising from incorporation of OCIMF technical specifications into the agreement.

        (v)     Limitation of Remedy

Under the terms of the Limited Warranty, Hewitt's exclusive remedy for a breach of warranty is limited to the repair of defective products or repayment of the purchase price. Hewitt argues the limitation of remedies provision does not limit its right to indemnification for breach of warranty because such right is independent of any contractual limitations.

Under Missouri law, a sales agreement may provide for remedies in addition to or in substitution for those provided in the UCC and may limit or alter the measure of damages recoverable, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts, unless the remedy fails of its essential purpose or is unconscionable. R.S. Mo. § 400.2-719(1). Hewitt does not argue the remedy fails of its essential purpose or that it is unconscionable. A plain interpretation of the contract language indicates the Limited Warranty is subject to the limitation of remedies.

Accordingly, Hewitt's contractual remedy for breach of the Limited Warranty, if established at trial, is the prorated purchase price of the hoses that failed during two years the Limited Warranty was in effect.

**F. Indemnification**

Hewitt's right to indemnification from HBD may arise from an express indemnification agreement or an implied right to indemnity. Based on Missouri law, an implied right to indemnity may arise if the manufacturer of a product breaches an express or implied warranty to the retailer. HBD argues it did not expressly agree to indemnify Hewitt, and Hewitt has no implied right to indemnity because the contract is governed by the UCC. Hewitt counters that HBD expressly agreed to take responsibility for any breach of warranty. In addition, Hewitt claims it has an implied right to indemnification based on its status as an intermediate seller.

(i) Applicable Law

The general rule under Missouri law is that, "[i]ndemnity is a right which inures to a person who has discharged a duty which is owed by him, but which, as between himself and another, should have been discharged by the other, so that if the second does not reimburse the first, the second is unjustly enriched to the extent that his liability has been discharged." State ex rel. Manchester Ins. & Indem. Co. v. Moss, 522 S.W.2d 772, 774 (Mo.1975) (en banc). However, "[t]he doctrine of indemnity applies only where an identical duty owed by one is discharged by another." Id.

Further, as applied to the relationship between a manufacturer and seller, a seller lower in the chain of distribution who sells a product without actual or constructive knowledge of a defect and who has no duty to inspect is entitled to indemnity against one higher in the chain, such as the manufacturer." Koeller By

and Through Koeller v. Unival, Inc., 906 S.W.2d 744 (Mo. Ct. App.1995).
Similarly, a United States District Court applied the Manchester decision in denying summary judgment to a manufacturer in a products liability action. See City of Clayton v. Grumman Emergency Prods., Inc., 576 F.Supp. 1122 (E.D.Mo.1983). The district court determined that:

> A retailer may have a right to indemnification from the manufacturer of a component part based on breach of either an express or implied warranty ... [if] the retailer ... show[s] that (1) he bought the part from the manufacturer to be held liable, (2) the same express or implied warranties he made to the consumer were made to him by the manufacturer, (3) the defect on which the retailer's breach of warranty liability was established constitutes a breach by the manufacturer of the same warranty as made to the retailer, and (4) he gave notice of the consumer's lawsuit against him to the manufacturer.

Id. at 1128.

                (ii)      Express Indemnification Agreement

The parties strongly dispute the meaning of the following provision:

> On equipment and materials furnished by the Seller but manufactured by others, Buyer shall accept in lieu of any liability or guarantees on the part of seller, the benefits of guarantees as are obtained by Seller from such manufacturers or vendors.[6]

Hewitt alleges that, by authoring the provision and agreeing that Hewitt re-issue the terms to Global, HBD intended to assume responsibility for any warranty liability claimed by Hewitt's customer. Hewitt argues the language only becomes meaningful when "Seller" refers to Hewitt and "Buyer" refers to Global because the provision otherwise has no relevance in context of HBD's transaction with Hewitt. HBD responds the provision is boilerplate language intended to apply where HBD sells a product manufactured by another. Here, rather, HBD refers only to itself as "Seller" and Hewitt

---
[6] Joint Stipulation of Facts (Doc. No. 256, ¶ 29).

17

as "Buyer," but does not otherwise create any direct responsibility between itself and Global.

The Court must determine whether the provision creates an express agreement that HBD will indemnify Hewitt for liability incurred for breach of warranty to Hewitt's customer. Within the HBD-Hewitt agreement, a plain reading of the provision indicates "Seller" refers to HBD and "Buyer" refers to Global. The evidence supports this was the intention of the parties.[7] Yet, since HBD was the exclusive manufacturer of the hoses the provision is rendered meaningless because there were no other manufacturers or vendors party to the HBD-Hewitt agreement. Hewitt does not claim to have negotiated this particular provision with HBD, and it is reasonable to believe it constitutes boilerplate language that exists in HBD's standard contract terms. Boilerplate provisions in a contract are not the consequence of the relationship of the particular parties and do not depend upon particularized intentions of parties. In re Payless Cashways, Inc., 215 B.R. 409, 416 (W.D. Mo. 1997). Hewitt does not support its interpretation of the provision with any evidence of the parties' intent. Accordingly, the Court will not interpret the terms in an unreasonable manner that imputes an obligation to HBD to indemnify Hewitt, merely to give the language effect in this transaction.

---

[7] An excerpt from Lesser's deposition provides:
Q. . . . [W]hat I understood your testimony to be when you (Lesser) and I were discussing these warranty provisions is that you weren't negotiating with HBD for a warranty that Global could enforce against HBD; you, on behalf of Hewitt, negotiated for a warranty with HBD that you knew you could enforce on HBD, and you went an negotiated a warranty with Global that you believed Global could enforce on Hewitt . . . .Is that fair?
A: Yes, that's fair.
(Doc. No. 204, Ex. 1 at 284:1-19).

### (iii) Implied Indemnity

The Eighth Circuit concluded on appeal that HBD and Hewitt had coextensive and identical duties to Global under the warranties of their respective agreements and, therefore, Hewitt may be entitled to indemnification from HBD for its liability to Global. See Global Petromarine, 577 F.3d at 847 (concluding Hewitt's inclusion of additional warranty in own brochure "would not necessarily cause Hewitt's obligations to Global to lose its coextensive and identical character with HBD's obligations to Global.") As discussed, however, HBD and Hewitt's contractual relationship includes a bargained-for limitation of remedies clause. Thus, the parties' contract, which was not an issue on appeal, may displace Hewitt's common law right to indemnity.

HBD argues any right to indemnification that Hewitt may have under common law is displaced by the parties' contract, which is governed by the UCC. HBD refers to Section 1-103, which states "[u]nless displaced by the particular provisions of [the Uniform Commercial Code], the principles of law and equity . . . and other validating or invalidating cause supplement its provisions." R.S. Mo. § 400.1-103(b). The Missouri Court of Appeals interprets this section to mean that "[i]f a provision of the UCC applies that displaces the common law, the common law contrary to that provision cannot apply." Cub Cadet Corp. v. Mopec, Inc., 78 S.W.3d 205, 209 (Mo. Ct. App. 2002).

A sales agreement may provide for remedies in addition to or in substitution for those provided in the UCC and may limit or alter the measure of damages recoverable, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts, unless the remedy fails of its essential purpose or is unconscionable. R.S. Mo. § 400.2-719(1).

The parties' negotiated limitation of remedy pursuant to Section 400.2-719, conflicts with the common law doctrine of implied indemnity. This is a situation in which Hewitt and HBD's negotiated agreement displaces the common law right to indemnity because granting indemnification would be contrary to HBD's proper limitation of remedies. An alternate finding would expose HBD to liability to Hewitt's end-buyer, Global, where HBD's Limited Warranty did not run with the goods. Further, the Court does not find the limited remedy of repair of defective products or repayment of the purchase price for breach of the Limited Warranty to fail of its essential purpose or be unconscionable. As such, the limitation of remedies provision in the agreement between HBD and Hewitt is effective, and Hewitt's contractual remedy for breach of the Limited Warranty is the prorated purchase price of the hoses that failed during two years the warranty was in effect. The Court thus finds as a matter of law that Hewitt is not entitled to implied indemnification from HBD.

## IV.     CONCLUSION

Based on the foregoing, the Court finds the agreement is binding over the parties. At trial, Hewitt must prove HBD breached the two-year prorated Limited Warranty to receive the exclusive relief negotiated under the contract. Accordingly, third-party defendant HBD's Motion for Partial Summary Judgment is **GRANTED**, and third-party plaintiff Hewitt's Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

Date:   12/17/10            **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri        Fernando J. Gaitan, Jr.
                             Chief United States District Judge